**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

RODNEY HANK WILLIAMS,

          Petitioner,

v.                               CIVIL ACTION NO.  2:04cv129
                                  CRIMINAL ACTION NO. 2:01cr231

UNITED STATES OF AMERICA,

          Respondent.

**UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Petitioner, a federal inmate, timely filed this <u>pro se</u> action by motion under 28 U.S.C. § 2255 seeking to vacate, set aside, or correct his sentence.  This action was referred in part to the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by Order entered on October 27, 2004, with directions to conduct an evidentiary hearing pertaining to one of petitioner's claims and to submit to the Court findings of fact and recommendations for the disposition of issues in the case.  An evidentiary hearing was conducted by the undersigned Magistrate Judge on July 26, 2005.

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

Petitioner, Rodney Hank Williams ("Williams"), was convicted by a federal jury on August 7, 2002, on twelve (12) counts of wire

fraud, two (2) counts of identity theft, and one (1) count of false use of a social security number.  On January 31, 2003, the Court sentenced Williams to sixty (60) months' imprisonment (concurrent) for the wire fraud counts; thirty-six (36) months' imprisonment (concurrent) for the identity theft counts; and twenty-six (26) months' imprisonment (consecutive) for the false use of a social security number count.  The sentences also included fines and a term of supervised release.  On appeal, the Court of Appeals for the Fourth Circuit affirmed Williams' conviction on July 29, 2003. During plea negotiations and trial, but not the sentencing hearing, Williams was represented by Duncan R. St. Clair III, Esq. ("St. Clair").[1]

Williams filed this action, pursuant to 42 U.S.C. § 2255, on

---

[1]The Court notes that Larry R. Shelton, Esq. ("Shelton") was initally appointed to represent Williams.  Shelton represented Williams during the preliminary hearing, after which Williams requested Shelton's removal.  The court next appointed Duncan R. St. Clair III, Esq. ("St. Clair"), as Williams' counsel.  St. Clair represented Williams through trial.  (St. Clair apparently also goes by the name "Bob St. Clair." Some testimony in this opinion refers to him by that name.)  Prior to sentencing, Williams requested St. Clair's removal.  The court then appointed Charles R. Burke, Esq. ("Burke") as counsel.  Burke represented Williams for sentencing and appeal.  For the instant habeas petition, Williams initially requested appointment of counsel.  Because the Court granted Williams' request for an evidentiary hearing, the Court also granted Williams' motion for counsel by appointing Kim M. Crump, Esq. ("Crump"), as counsel.  As discussed, infra note 9, Williams subsequently filed a motion to remove Crump as counsel, which the Court granted, while requiring Crump to continue to assist Williams through the evidentiary hearing as stand-by counsel.

February 29, 2004,[2] against the United States.   (Doc. No. 69).

Williams alleged in his motion the following grounds for relief: 1)

denial of right to effective assistance of counsel at trial; 2)

denial of effective assistance of counsel during appeal; 3) illegal

sentencing; and 4) denial of right to fair and impartial trial.

The United States filed its response to Williams' motion on

June 17, 2004.[3] (Doc. No. 83).   Williams filed his reply to this

_____

[2]Williams appears to have originally executed his motion on
February 29, 2004.  The petition was stamped as filed with this
Court on March 1, 2004. The petition was accompanied by a request
for forms to proceed in forma pauperis.
     The Court notes that the United States Supreme Court
promulgated certain amendments to the Rules Governing Section 2255
Cases in the United States District Courts, which became effective
on December 1, 2004.  As amended, Rule 3(d) adopts the prison
mailbox rule with regard to § 2254 petitions.  Accordingly, the
Court recognizes the prison mailbox rule for federal habeas
petitions.  In this case, as there is no evidence in the record to
the contrary, the Court will assume that Williams delivered his
federal habeas petition for mailing on the date he signed it,
February 29, 2004.  Further, the Court considers Williams' petition
as filed, for statute of limitations purposes, on that date.
     Along with his § 2255 Motion, Williams submitted a Motion for
Recusal and a Memorandum in Support of Recusal (Attachment to Doc.
No. 70).  Because the Court construes this motion as outside the
limited scope of the evidentiary hearing provided for in Judge
Jackson's October 27, 2005, Order, see infra, section II, the Court
declines to consider it at this time.  On March 8, 2004, Williams
filed an Amended Memorandum in Support of § 2255 Motion (Doc. No.
72).

[3]The Honorable United States District Judge Raymond A. Jackson
("Judge Jackson") originally entered an Order on March 5, 2004,
directing Respondent to file a response to Williams' motion within
forty-five (45) days of that Order.  (Doc. No. 71).  This deadline
was entered on the docket as April 9, 2004.
     On April 16, 2004, Respondent requested a "continuance" until
June 3, 2004, to file its response.  (Doc. No. 73).  On April 19,
2004, Judge Jackson entered an Order granting this motion.  (Doc.
No. 74).  The deadline was thereby extended to June 17, 2004.  On

response, on July 6, 2004.[4]  (Doc. No. 85).

On April 28, 2004, Williams filed a Motion Requesting Evidentiary Hearing.[5]  (Doc. No. 76).  On October 28, 2004, Judge Jackson entered an Order partially granting this motion, directing

---

April 28, 2004, Williams filed a Motion to Deny Respondent's Extension Request.  (Doc. No. 75).  As grounds for this request, Williams argued that he had not received a copy of Respondent's motion for the extension (his notice came from the Court's Order granting the motion); the Court's granting of Respondent's request showed bias as contrasted with the short period of time accorded Williams between appointment of trial counsel and his trial; and the Court had not yet ruled on motions previously filed by Williams.  This motion was construed as a reply to Respondent's Motion, and was, consequently, mooted by the Court's prior Order granting said Motion.

On May 24, 2004, Respondent filed another request for extension to file a response; part of the justification for this request was Williams' intervening motions.  (Doc. No. 79).  On May 25, 2004, Judge Jackson granted this motion.  (Doc. No. 80).  On May 29, 2004, Williams filed a motion opposing the extension. (Doc. 82).  This motion was construed as a reply to Respondent's Motion, and was, consequently, mooted by the Court's prior Order granting the motion.

[4]This response was filed by the Court on July 12, 2004.  It was accompanied by several exhibits, including an affidavit from Louis Williams House, Sr. ("House"), attesting to a conversation between Williams and Burke, see supra, note 1, Williams' attorney for sentencing and appeal, to the effect that Williams wanted to review any briefs Burke prepared before they were filed.  House made no reference in this affidavit to St. Clair's representation of Williams.  The Court notes that House's portion of the affidavit was dated May 8, 2004, but the portion signed by the Notary Public was dated May 9, 2004.

[5]On November 10, 2004, Williams filed a Renewed Motion Requesting Evidentiary Hearing.  (Doc. No. 88).  There is no reference in the motion to Judge Jackson's October 27, 2004, Order granting a limited evidentiary hearing.  Because the Court construes this motion as outside the limited scope of the evidentiary hearing provided for in that October 27, 2005, Order, see infra, section II, the Court declines to consider it at this time.

the undersigned Magistrate Judge to conduct an evidentiary hearing and file proposed findings and recommendations on the sole issue of whether "Duncan St. Clair III [, Esq.,] was ineffective for failing to obtain and review a plea agreement with [Williams] prior to trial."  (Doc. No. 87).

On April 28, 2004, the same date Williams made his first request for an evidentiary hearing, he also filed[6] a Motion for

---

[6]Both of these motions were signed on April 28, 2004, but were stamped as filed by the Court on May 5, 2004.  The Motion for Appointment of Counsel was accompanied by an undated Motion to Proceed in Forma Pauperis, an Affidavit or Declaration in Support of Motion for Leave to Proceed in Forma Pauperis, executed on October 17, 2003, and several other attachments.  The Court construes this "motion" as support for the Motion for Appointment of Counsel, which was granted by the Court's December 29, 2004, Order appointing counsel.
Williams filed several additional motions and supporting documents.  On May 4, 2004, Williams executed a Memorandum of Law in Further Support of Motion for Recusal, accompanied by an Affidavit of Disqualification/Prejudice.  (Doc. No. 78).  On May 31, 2004, Williams filed a Motion for Discovery.  (Doc. No. 81).  On July 6, 2004, Williams filed a Motion for Emergency Bail.  (Doc. No. 84).  On September 17, 2004, Williams filed a Motion to Expedite § 2255 Ruling.  (Doc No. 86).  On November 12, 2004, Williams executed Petitioner's Objections to the Limitations In The Court's 10/28/2004 Order and a Renewed Motion for Bail.  (Doc. Nos. 90 and 91).  On January 25, 2005, the Court filed Williams' unsigned Motion to Expand the Record (which was submitted with a cover letter signed by appointed counsel), subject to defect.  (Doc. No. 98).  The Court considers the Motions for Discovery and to Expand the Record as mooted by Williams' later filed motions; as such, see infra, section II, the Court dismisses these motions.  Because the Court construes the remainder of the above motions as outside the limited scope of the evidentiary hearing provided for in Judge Jackson's October 27, 2005, Order, see infra, section II, the Court declines to consider them at this time.

Appointment of Counsel[7] (Doc. No. 77).   The undersigned Magistrate Judge, entered an Order on December 29, 2004, granting this motion by appointing Kim M. Crump, Esq. ("Crump") to represent Williams in connection with the evidentiary hearing (Doc. No. 95); Crump was later designated as stand-by counsel in response to Williams' subsequent request to proceed <u>pro se</u>.[8]   On February 2, 2005, the undersigned Magistrate Judge held the initial pretrial conference for the evidentiary hearing.   On February 11, 2005, <u>nunc pro tunc</u> February 2, 2005, the undersigned Magistrate Judge entered an Order setting the general deadline for preliminary motions, setting specific deadlines for motions relating to Williams' transcript request, and addressing Williams' prior motions.[9]   (Doc. No. 102).

---

[7]On November 6, 2004, Williams submitted a second Motion for Appointment of Counsel. (Doc. No. 89).   This Court dismisses this motion, <u>see infra</u>, section II, as moot.   See Order, December 29, 2004 (appointing counsel); <u>see also</u> Order, February 11, 2005, at 3 n.3.

[8]<u>See infra</u>, note 9.

[9]<u>See supra</u>, note 6.
    On February 8, 2004, Williams filed a Motion for Transcript. (Doc. No. 100).   On February 10, 2004, Respondent filed a response to this motion, raising concerns about the process of providing Williams a transcript, but expressly stating it had "no objection" to Williams' request for a transcript.   (Doc. No. 101).   On February 11, 2004, the undersigned Magistrate Judge entered an Order granting Williams' motion for a transcript. (Doc. No. 103).   On March 4, 2005, Judge Jackson entered an Order vacating the February 11, 2004, Order, because he had determined that Burke, Williams' counsel for sentencing and appeal, <u>see supra</u>, note 1, had already been given a complete copy of the trial transcript.   (Doc. No. 116).
    On February 23, 2004, Williams filed the following pleadings with assistance of appointed counsel: Motion #1.   Motion for Leave

On July 5, 2005, and July 6, 2005, Williams and Respondent filed, respectively, their proposed witness lists with the Court. (Doc. Nos. 123 and 122).  On July 8, 2005, the undersigned Magistrate Judge entered an Order approving the witness lists with the exclusion of Williams' request to subpoena Mr. Michael Smythers ("Smythers"), Supervisory Assistant United States Attorney.  The

---

to File Additional Motions (Doc. No. 106); Motion #2.  Motion for Discovery (Doc. No. 107); Motion #3.  Motion to Expand Record to Include Additional Issues (Doc. No. 108); Motion #4.  Motion for Recusal of Prosecutor (Doc. No. 109); Motion #5.  Motion to Represent Himself Pro Se (Doc. No. 110); Motion #6.  Motion to Expand Record to Include Additional Evidence (Doc. No. 111); Motion #7.  Motion for Bail (Doc. No. 112); Motion #8. Motion for Mental Examination [for Kenneth Williams] (Doc. No. 113); Request for Production of Documents (Doc. No. 114); and Request for Admissions (Doc. No. 115).  On March 9, 2005, Respondent filed a response to these motions.  (Doc. No. 117).  In an Order (Doc No. 121) dated June 29, 2005, the undersigned Magistrate Judge denied Motions #1, #3, #8, Request for Production of Documents, and Request for Admissions; granted in part and denied in part Motions #2 and #6; granted Motions #4 and #5; and declined to consider Motion #7. This Order also directed the parties to submit proposed witness lists to the Court by July 7, 2005.

Even though the Court did not rule on Williams' motion to proceed pro se until June 29, 2005, see supra, Williams began filing motions without assistance of counsel.  On March 21, 2005, Williams filed a Motion to Correct Perjury.  (Doc. No. 143)  On April 3, 2005, Williams filed a Motion for Summary Judgment.  (Doc. No. 119).  On April 16, 2005, Williams filed a Motion to Stop Judicial Fraud.  (Doc. No. 120).  On July 8, 2005, Williams filed a Motion for Designation as a Miscarriage of Justice and Motion for Protection (Doc. No. 125), and a Motion to Modify the Court's 10/27/2004 Order to Remove Unlawful Limitations (Doc. No. 126).  On July 19, 2005, Williams filed a Renewed Motion to Correct Perjury and Invocation of Additional Rights.  (Doc. No. 131).  On August 10, 2005, Williams filed a Motion to Invoke Additional Rules Provided for by Law.  (Doc. No. 138).  Because these motions address issues outside the limited scope of the evidentiary hearing provided for in Judge Jackson's October 27, 2005, Order, see infra, section II, the Court declines to consider them.

Court directed additional briefs be filed on this issue.  (Doc. No. 124).  On July 11, 2005, Williams filed an Objection to Stipulation and Motion for Deposition accompanied by a supporting affidavit dated July 11, 2005.  (Doc. Nos. 128 and 127).[10]  On July 14, 2005, Respondent filed a formal objection to Williams' summons request for Smythers.  (Doc. No. 129).  On July 15, 2005, Williams filed Petitioner's Objections and Reply to Government's Objection to Request for Summons.  (Doc. No. 130).  On July 21, 2005, the undersigned Magistrate Judge entered an Order sustaining Respondent's objections and denying Williams' request for a subpoena for Smythers.  (Doc. No. 132).

## II.  <u>MOTIONS</u>

As a preliminary matter, the Court reviews Williams' outstanding motions.  The Court considers the following motions as outside the limited scope of the evidentiary hearing provided for in Judge Jackson's October 27, 2005 Order: Motion for Recusal (Attachment to Doc. No. 70); Renewed Motion for Evidentiary Hearing (Doc. No. 88); Motion for Emergency Bail (Doc. No. 84); Motion to Expedite § 2255 Ruling (Doc. No. 86); Renewed Motion for Bail (Doc. No. 91); Motion for Bail (Doc. No. 112); Motion to Correct Perjury (Doc. No. 143); Motion for Summary Judgment (Doc. No. 119); Motion

---

[10]Because the accompanying affidavit was dated after the Objection, the Court considers both documents as provided to prison officials for mailing, and therefore filed, on the later date, July 11, 2005.

8

to Stop Judicial Fraud (Doc. No. 120); Motion for Designation as Miscarriage of Justice and Motion for Protection (Doc. No. 125); Motion to Modify the Court's 10/27/2004 Order to Remove Unlawful Limitations (Doc. No. 126); Renewed Motion to Correct Perjury and Invocation of Individual Rights (Doc. No. 131); and Motion to Invoke Additional Rules Provided for by Law (Doc. No. 138); see supra, notes 2, 6, 9; consequently, the Court declines to rule on these motions.

The Court considers Williams' Motion for Discovery (Doc. No. 81) and Motion to Expand the Record (Doc. No. 98) as mooted by Williams' later filed Motion for Discovery (Doc. No. 107), which the Court denied in part and granted in part, and Motion to Expand the Record to Include Additional Issues (Doc No. 108), which the Court denied. See supra, note 9, Order, June 29, 2005 (Doc. No. 121). Consequently, the Court hereby DENIES both of these motions. The Court considers Williams' second Motion for Appointment of Counsel (Doc. No. 89) as mooted by the Court's December 29, 2004, Order, appointing counsel; consequently, the Court hereby DENIES this motion. Finally, the Court considers Williams' Motion for Transcript of 8/9/2005 Proceedings (Doc. No. 137), which was submitted after the evidentiary hearing in conjunction with his findings of fact and conclusions of law, see supra, note 27. Because the basis for this motion was to enable Williams to prepare the corresponding findings of fact and conclusions of law, and

9

because the motion was filed simultaneously with Williams' findings of fact and conclusions of law, the court considers this motion to be untimely and moot and, hereby, DENIES said motion.

### III.  **EVIDENTIARY HEARING**

In accordance with Judge Jackson's October 27, 2004, Order, directing the undersigned Magistrate Judge to "conduct hearings, including evidentiary hearings, if necessary, . . . regarding the issue of [St. Clair]'s alleged ineffectiveness for failure to obtain and review the plea agreement with [Williams] prior to trial," the undersigned Magistrate Judge held the evidentiary hearing on July 26, 2005, at the United States District Court for the Eastern District of Virginia, Norfolk Division. (Transcript, Doc. No. 133).  Williams proceeded pro se, including conducting witness examinations, with assistance from stand-by counsel,[11] Kim M. Crump, Esq.  Robert J. Seidel, Jr., Esq. ("Seidel"), appeared on behalf of Respondent.

In support of his case, Williams called and elicited testimony from five (5) witnesses:  Mark Wilcox ("Wilcox"), representing the Western Tidewater Regional Jail; St. Clair; Michael Rosenblum, Esq. ("Rosenblum"); Robert Sandwich, Esq. ("Sandwich"); and Steven W. Haynie, Esq. ("Haynie").  Rosenblum and Sandwich were associates in St. Clair's office, and assisted with Williams' case.  Haynie had

---

[11]See supra, note 9, addressing Williams' motion to proceed pro se.

10

prosecuted the case at trial.  Williams declined to testify on his own behalf.  In addition to witness testimony, Williams offered the following three (3) exhibits into evidence: a copy of the prison visitation log and photo of Williams (Petitioner's Exhibit No. 1); copy of Williams' plea agreement (Petitioner's Exhibit No. 2); and the hourly worksheet St. Clair submitted to this Court for reimbursement of his representation of Williams at trial (Petitioner's Exhibit No. 3).

Respondent did not call any witnesses on its behalf. Respondent offered the following four (4) exhibits into evidence: a copy of Williams' plea agreement[12] (Government's Exhibit No. 1); Williams' letter to St. Clair (Government's Exhibit No. 2); Williams' letter to Keith Kimball, Esq. ("Kimball")[13] (Government's Exhibit No. 3); and Haynie's letter to Shelton, see supra, note 1, discussing the prison guidelines applicable to Williams (Government's Exhibit No. 4).

The Court next summarizes the testimony of the witnesses called to testify at the hearing, on July 26, 2005.  The Court's summary follows as closely as possible the precise verbiage employed by

---

[12]According to witness testimony, the copy of the plea agreement offered by the Government was the same as the agreement offered by Williams.  Williams did not make any allegations regarding the contents of the plea agreement.

[13]Williams was jointly tried with his wife, Elizabeth House Janes ("Janes").  Kimball was Janes' lawyer.  Janes is referred to in the trial transcript as "James."

each witness.

## A.   Testimony of Mark Wilcox

Williams called Mark Wilcox, Director of Security at the Western Tidewater Regional Jail, Suffolk, Virginia, as the first witness. Transcript dated July 26, 2005 ("Tr.") at 15. Wilcox testified that he had worked at the jail for 12-1/2 years. Id.

Wilcox identified documents submitted as Petitioner's Exhibit No. 1. Tr. at 17-18. These were copies of excerpts from the jail's visitation logs, and an undated photograph of Williams from his inmate record. Tr. at 17. Wilcox testified that the visitation logs were kept in sequence, in the regular course of business. Tr. at 18. Wilcox testified that according to the log, "Bob St. Clair" visited Williams on July 25, 2002, and that was the only entry Wilcox could find for St. Clair prior to August 1, 2002. Tr. at 18-19, 21-22. Wilcox also testified that the log showed two attorneys, "M. Rosenblum" and "B. Sandwich," visited Williams on June 25, 2002. Tr. at 19-20. Wilcox explained that the log is completed by the attorneys in order for the prison officials to know which inmate to call to the panel. Tr. at 20. Consequently, if more than one attorney visits a prisoner at the same time, the log may not necessarily reflect all the attorneys present. Id.

Wilcox testified that the process for attorney visitation was that the attorney fills out the log, providing his name and who he wants to see, and the officer calls the inmate down to the

12

visitation panel.  Tr. at 22.  Attorneys do not need to schedule appointments in advance, and they do not enter the secure area of the jail.  Id.  There are no restrictions for attorneys to visit clients.  Id.  Specifically, if an inmate was in a disciplinary status within the jail, that would not result in a restriction on attorney visits.  Tr. at 22-24.  There are normal hours of visitation prescribed for attorney visits.  Tr. at 23.  The logs do not indicate the length of the visits.  Tr. at 26-27.

The jail has four (4) attorney panels, side by side, that can be classified as rooms.  Tr. at 24.  Each side of the panel is the size of the stand in the courtroom, with a glass partition, and a telephone.  Tr. at 25.  There is one side for the inmate and the other for the attorney.  Id.  The inmate and attorney can talk to each other using the telephone, and it is very, very difficult for someone not using the telephone to hear anything.  Id.  Wilcox testified that if two attorneys visited a prisoner, they might both be able to hear by sharing the earpiece of the telephone.  Id.  There is no direct contact between the attorney and the inmate and no way for the inmate to pass anything to the attorney without going through an officer.  Tr. at 26.  For an attorney to pass something to an inmate, he would have to hand-deliver it to an officer, and the officer would have to take it to the inmate from the other side of the glass partition.  Id.

Wilcox testified that the current inmate telephone system had

only been in place for approximately eleven (11) months, and was completely different from the system in place at the time frame at issue.  Tr. at 27.  Wilcox believed that the old system only permitted collect calls.  Id.  Wilcox was not involved with the old system.  Tr. at 28.  Telephone hours are from ten (10) in the morning until ten (10) at night.  Tr. at 29.

During cross-examination, Wilcox testified that the log reflected a visit on July 12, 2002, to Williams by "Sandwich," at 3:35 p.m.  Tr. at 31.  There was also an entry on July 31, 2002, for a visit to Williams by "Bob St. Clair" at 1:10 p.m.  Tr. at 31-32.  The log also reflected that at that same date and time "Keith Kimball" visited Williams.  Tr. at 32.

During redirect, Wilcox could not recall when the attorney visitation hours ended for visits in the July 12, 2002, time frame.  Tr. at 32-33, 35.  On the date Wilcox testified, July 26, 2005, attorney visitation hours lasted from 7:30 a.m. to 9:30 p.m. with no breaks.  Tr. at 33-34.  Wilcox stated that the time in the log was the time the visit started, and reiterated that the log does not show the duration of the visit.  Tr. at 34.

## B. Testimony of Duncan St. Clair III

Williams next called Duncan St. Clair III, who had been appointed as Williams' second counsel on June 21, 2002.  Tr. at 36. St. Clair stated that he had provided all of his notes on Williams' case to Crump, with the exception of documents that had previously

14

been tendered to Burke.  Tr. at 37.  St. Clair testified that he was admitted to the Virginia Bar and was bound by the Code of Professional Responsibility.  Id.  St. Clair had been admitted to the Federal Bar for twenty (20) years, but was unsure if he was a member of a trial lawyers association.  Tr. at 38.

St. Clair did not know if trials in federal court are rare, but did believe that the majority of federal cases result in plea agreements.  Tr. at 39.  St. Clair agreed that plea agreements are very important and require critical negotiations to minimize penalties and loss of liberty.  Tr. at 39-40, 67.  St. Clair "guess[ed]" that most plea agreements have time limitations, and believed that Williams' plea agreement was written with a limitation as to the date it had to be accepted.  Tr. at 40-41, 67. St. Clair "believe[d]" the limitation on Williams' plea agreement was that it had to be accepted prior to trial.  Tr. at 41.

St. Clair stated that either he or his associates would go see Williams to review pleadings, discuss facts in the case, and basically help Williams prepare for either the plea or for trial. Tr. at 45.  St. Clair agreed that lawyers must be sensitive to the rights and wishes of their clients and act scrupulously in the making of decisions, which may involve disclosure of information obtained in the professional relationship.  Tr. at 46.  St. Clair did not believe there was any prohibition against using lawyers in the same firm to assist in the preparation for trial.  Tr. at 47.

15

St. Clair did not believe it was improper to bring another attorney in a case without the full disclosure and consent of the client. Id.  St. Clair stated that there were a number of times when other lawyers were present at his meetings with Williams and St. Clair assumed Williams assented to this because Williams proceeded with the interview.  Tr. at 47, 80.  When other lawyers were present at interviews with Williams, St. Clair introduced them before the interview began.  Tr. at 48.  St. Clair brought in the other lawyers to assist him in preparing for Williams' case and did not view them as insulation.  Tr. at 49.  St. Clair stated he relied on other lawyers for the in-person contact with Williams because they could spend more time with Williams, they were well-familiar with his case, they were former prosecutors, and they were extremely experienced in criminal law.  Tr. at 73.

St. Clair was presented Petitioner's Exhibit No. 2, the plea agreement.  Tr. at 44.  St. Clair acknowledged it was signed by Smythers on July 1, 2002.  Id.  It also had an undated signature of Assistant United States Attorney Stephen Haynie.  Tr. at 44-45. The agreement also included signature blanks for "Rodney Hank Williams" and "Duncan R. St. Clair."  Tr. at 45, 56.  St. Clair acknowledged that his name, but not his associates' names, appeared on the plea agreement.  Tr. at 45-46. St. Clair acknowledged that it appeared that Smythers approved the agreement on July 1, 2002. Tr. at 45.  St. Clair acknowledged that if the plea agreement was

16

dated correctly, he could not have received it prior to July 1, 2002.  Tr. at 54, 62.  St Clair stated that the plea agreement stated that he had reviewed the sentencing guidelines and policy statements with Williams.  Tr. at 57.

After Williams told St. Clair he wanted to plead guilty, St. Clair contacted Haynie to initiate a plea agreement.  Tr. at 43, 61-62, 95-96.  St. Clair and Haynie discussed a plea agreement developed in conjunction with Williams' previous attorney, Shelton. Tr. at 61-62.  St. Clair also told Haynie that Williams wanted a plea agreement that would protect Janes, that this was very important to him, and that Williams had expressed some concern that he didn't think the plea agreement appropriately addressed her situation.  Tr. at 62, 67.  St. Clair stated he negotiated the plea agreement in good faith to give Williams an opportunity to have a lenient sentence and to spare Janes a prison sentence.  Tr. at 100. St. Clair did not recall when he received the plea agreement from the U.S. Attorney's Office nor could he recall whether it came by fax or by mail.  Tr. at 53.  St. Clair also believed he received a draft of the plea agreement prior to the formal plea agreement. Id.  St. Clair also had telephone conversations with Haynie in which they "went over, at length, the guidelines, the suspected calculations, the level of [Williams'] complicity, what [they] thought would be the ultimate result [for Williams], and what [they] thought [they] could do to help . . . [Janes]."  Tr. at 53-

17

54.

St. Clair stated that after he received the plea agreement, it was either mailed to Williams or brought out to him by someone in the firm.  Tr. at 61.  St. Clair stated he knew that the plea agreement had been reviewed with Williams before St. Clair's first in-person visit because the reason for that visit was to make sure that Williams and St. Clair were both using the same document and to determine whether Williams was accepting or rejecting the plea agreement.  Tr. at 61.  St. Clair stated that attorneys from his office brought the plea agreement to Williams on several different occasions.  Tr. at 43, 96-97.  On some occasions, Williams wanted the plea agreement, and on other occasions he said he didn't want the plea agreement.  Tr. at 43, 71, 97.

St. Clair recalled that Williams asked him to contact Kimball to "prepare a joint defense," that this was an important issue for Williams.  Tr. at 69-70.  St. Clair denied misleading Williams into believing he had coordinated the defense with Kimball.  Tr. at 70. St. Clair did not believe that Williams was ever confused about whether a plea agreement they were discussing was for Williams or for Janes.  Tr. at 70.

St. Clair recalled reviewing the plea agreement with Williams line-by-line at least twice during the month of July, 2002, but could not recall whether it was by phone or in person, through another attorney in St. Clair's office, or in conjunction with the

18

other attorney's in St. Clair's office.  Tr. at 43, 49, 51, 74, 95.
He also could not recall if it was two separate occasions or if he
read through it twice during one occasion.  Tr. at 55.  St. Clair
stated that after he reviewed the plea agreement with Williams, he
called Haynie and told Haynie he (St. Clair) believed Williams had
accepted the agreement.  Tr. at 51, 95.

When St. Clair brought the plea agreement to present it to
Williams, he handed it to the guard to pass to Williams.  Tr. at
60.  After St. Clair stepped out to allow this to happen, he could
see through the glass that Williams had the document because
Williams held it up.  Tr. at 60.  On the third or fourth occasion
that Williams had the plea agreement in his hand, he wanted to
retain it to review it to make sure it was the same agreement St.
Clair read to him.  Tr. at 60, 97.  St. Clair never got the plea
agreement back.  Tr. at 60.

St. Clair did not read the entire sentencing guidelines to
Williams, but he and Williams talked about the sentencing
guidelines and St. Clair explained their ramifications, how they
affected Williams' case, and what St. Clair "suspected . . . the
ultimate calculations would be [for Williams'] case."  Tr. at 57.
St. Clair stated he further advised Williams that he couldn't tell
him what would happen, and that the judge would instruct Williams
that even if St. Clair and Haynie were wrong, Williams could be
bound by the agreement anyway.  Tr. at 57.   Further, he advised

19

Williams that the judge doesn't even know what's going to happen until the presentence report is prepared and the guidelines are calculated.  Tr. at 57.  St. Clair stated he would have used the sentencing guidelines in effect at the time of trial, for the specific provision for which Williams was charged, which St. Clair believed to be wire fraud, under Title 18, Section 1343.  Tr. at 58.  St. Clair stated that he keeps the current guidelines in a three-ring binder that he brings out for each individual defendant. Tr. at 59.

St. Clair stated that Williams wrote him a letter,[14] rejecting the plea agreement, stating he did not want it.  Tr. at 43, 95, 97. Subsequent to that, Williams spoke to St. Clair and said he did want the plea agreement.  Tr. at 43, 95, 97.  So, St. Clair went back out to go over the plea agreement, and it was his understanding, at the end of that meeting, that Williams did not want the plea agreement.  Id.  St. Clair did not recall providing Williams a written acknowledgment to document that St. Clair had reviewed the plea agreement with him.  Tr. at 42.

St. Clair did not recall how often he visited Williams or in what type of room they met.  Tr. at 50, 81.  St. Clair was presented the jail log (Petitioner's Exhibit No. 1), and confirmed

---

[14]St. Clair did not provide testimony as to the date of this letter or when he received it.  This letter, dated July 18, 2002, was admitted into evidence, infra, during St. Clair's cross-examination, as Government's Exhibit No. 2.

that it showed he visited Williams on July 25, 2002.  Tr. at 52, 56.  St. Clair stated that this meeting was not to discuss witness testimony or to discuss "Jencks Act material"; he and Williams reviewed the plea agreement on that date.  Tr. at 84, 87.  St. Clair also indicated that the log showed he visited Williams on July 19, 2002, at 6:30 p.m.  Tr. at 53, 56.  St. Clair could not remember exactly what they talked about that day, but was sure they discussed the plea agreement because he and Williams always talked about the plea agreement during their visits.  Tr. at 53, 56, 82. St. Clair stated that prior to that visit, in a letter dated July 18, 2002, Williams rejected the plea agreement.  St. Clair stated that during the July 19, 2002, visit, he and Williams also discussed a motion to dismiss that Williams wanted to file for prosecutorial misconduct.  Tr. at 75.  St. Clair did not recall Williams stating that he would file the motion himself if St. Clair chose not to file it, but St. Clair did caution Williams against filing anything independently.  Tr. at 76.  St. Clair also advised Williams not to contact the U.S. Attorney directly.  Tr. at 76. St. Clair stated that he and Williams did not talk about Apprendi v. New Jersey[15] at that meeting; St. Clair believed Williams discussed that case with Sandwich.  Tr. at 75.  St. Clair pointed out that his associates Rosenblum and Sandwich were listed on the

_____

[15]530 U.S. 466 (2000).  This case held that the Fourteenth Amendment required that factual determinations supporting sentence enhancements be determined by the jury beyond a reasonable doubt.

log as visiting Williams on June 25, 2002, but St. Clair did not remember being there himself on that date.  Tr. at 55.  St. Clair indicated that the log showed he also visited Williams on July 31, 2002, and that they discussed the plea agreement on that date.  Tr. at 43, 82, 87.  St. Clair also recalled a visit outside normal visiting hours, and not listed in the log, in which he was allowed to visit Williams.  Tr. at 86.   St. Clair did not recall visiting Williams with Kimball.  Tr. at 41. St. Clair did not have any written records to verify the dates of his visits.  Tr. at 86.  St. Clair acknowledged that it might be possible to sign the prison log, and not meet with a prisoner, but he had never done that in all the years he had practiced law.  Tr. at 86.  St. Clair did not recall telling Williams he was going to meet with him over the trial weekend to prepare him for testimony, but St. Clair did give Williams the plea agreement and Williams was supposed to call St. Clair if he reflected on it further.  Tr. at 87-88.

St. Clair didn't feel the need to be physically in the same room with Williams to communicate with him.  Tr. at 63.  He was satisfied with communication by phone and through other attorneys. Tr. at 63, 77, 96.  He only felt the need to visit Williams when communication broke down.  Tr. at 63.  He thought he had spelled this out to Williams in painstaking detail and that Williams understood it.  Tr. at 63.  St. Clair did not recall discussing contact problems at the July 19, 2002, meeting.  Tr. at 75.  St.

22

Clair did state that he took another attorney with him for both visits because Williams had misrepresented something he said.   Tr. at 79.   St. Clair wanted somebody else to verify what transpired.   Tr. at 80.   St. Clair acknowledged that the log did not show another attorney present for the July 19, 2002, visit.   Tr. at 80.

St. Clair did not recall if Williams was housed in Western Tidewater Regional Jail during the full time that St. Clair represented him.   Tr. at 64.   St. Clair stated he did not know the options for the telephone system at that jail, that he had received three-way and collect calls from prisoners, and also had bought direct time for prisoners to place calls.   Tr. at 65.   St. Clair stated that he would not know which of these options was used if he did not answer the phone himself, and usually the secretary or paralegal would talk to the inmates before St. Clair talked to them.   Tr. at 66.   St. Clair acknowledged that Williams had complained on several occasions, including by letter, that some of his calls were not accepted by St. Clair's office.   Tr. at 65.   St. Clair did not know how many of Williams' calls his office had accepted. Tr. at 65.   St. Clair would not know if a call had been accepted or rejected if his secretary did not tell him about it. Tr. at 66.   St. Clair did not have telephone records available to show what calls had been accepted.   Tr. at 66-67.   In response to Williams' complaints about telephone communication, St. Clair also provided Williams his home phone number, and Williams used it to

call him collect on more than one occasion.  Tr. at 72-74.  These calls were not billed to Williams' case because the costs far exceeded the allotment.  Tr. at 73.  St. Clair also stated that he did not keep a copy of the voucher he filed with the court for the time he spent on Williams' case, that he didn't have anything to do with accounting, and that the voucher[16] would not be part of the client's file.  Tr. at 91-92.

St. Clair did not recall Williams being angry at their first meeting.[17]  Tr. at 71-72.  St. Clair stated he did not think Williams was displeased with his representation because Williams attempted to name St. Clair as his counsel for a civil suit.  Tr. at 72.  St. Clair did not think Williams was upset with him until after Williams was convicted.  Tr. at 72.

St. Clair stated that his understanding of his removal from the case was because he was "a member of USAA Insurance."[18]  Tr. at

---

[16]Williams was able to later request this voucher directly from the court.  It was entered into evidence as Petitioner's Exhibit No. 3.  Tr. at 124, 171.

[17]St. Clair did not specify the date of that meeting at this point in the transcript.
    Following this statement, St. Clair responded to a series of questions to the effect that he denied that he told Williams he [St. Clair] was an atheist to calm Williams down, adding that he was not an atheist.  Tr. at 71.  In the middle of Williams' next question, the Court sustained an objection as to relevancy that applied to this entire line of questioning.  Tr. at 71-72.  Consequently, the Court does not consider these responses as part of the record.

[18]This was one of the insurance companies Williams was charged with defrauding in the underlying criminal case.

77.  This occurred in open court after the trial, but before the sentencing phase.  Tr. at 77.  St. Clair stated that at that point Williams was upset and it became impossible for St. Clair and Williams to communicate any further.  Tr. at 77.  Williams would not communicate about the sentencing issues of his case, and only wanted to talk about misconduct in the judiciary, misconduct of the prosecution, and misconduct of his prior defense attorney.  Tr. at 77.  Williams was unhappy with the system.  Tr. at 77.  St. Clair stated that Williams' request for new counsel hurt his case because his sentencing was delayed as a result, and in the interim, new sentencing guidelines came out.  Tr. at 77-78.

St. Clair denied that any of his actions prejudiced Williams' case.  Tr. at 93-95, 97.  St. Clair stated that he was diligent in Williams' defense and was forthright with him on all occasions. Tr. at 99.  St. Clair speculated that Williams was unsuccessful at trial because he committed fraud and was convicted for it and that he was unhappy with St. Clair's representation solely because he went to trial and lost.  Tr. at 99-100.  St. Clair also testified that he did not know a person named George Ellison.[19]  Tr. at 97.

During cross-examination, St. Clair was shown another copy of the plea agreement, labeled Government's Exhibit No. 1, and acknowledged that it appeared to be the same agreement as

---

[19]Williams provided no explanation for this question.  See Tr. at 97.

Petitioner's Exhibit No. 2.  Tr. at 101-02.  St. Clair confirmed
that Government's Exhibit No. 2 was a letter, dated July 18, 2002,
that St. Clair had received from Williams.  Tr. at 102, 104.  St.
Clair read a portion of the letter that stated Williams "rejected
the Government's offer" "and to prepare for trial immediately."
Tr. at 103.  St. Clair talked to Williams after receiving this
letter, and Williams decided to accept the plea agreement.  Tr. at
104.  St. Clair reiterated that Williams wanted St. Clair to
coordinate with Kimball to make sure Williams' plea agreement was
in Janes' best interest, and hopefully, enable Janes to avoid
incarceration.  Tr. at 105.  Williams even gave Kimball's telephone
number to St. Clair .  Tr. at 105.

St. Clair identified Government's Exhibit No. 3 as a letter
from Williams to Kimball.  Tr. at 105.  St. Clair had previously
seen a copy of the letter, which Kimball faxed to him on July 18,
2002, at 6:57 a.m.  Tr. at 106.  St. Clair read an excerpt to the
effect that Williams had "rejected the Government's offer."  Tr. at
106.  St. Clair stated he discussed this letter with Williams.  Tr.
at 107.  St. Clair identified Government's Exhibit No. 4 as a June
19, 2002, letter signed by Haynie and sent to Shelton detailing the
relevant sentencing guidelines.  Tr. at 108-09.  Shelton had given
St. Clair this letter and St. Clair had discussed its contents with
Haynie.  Tr. at 108-09.

During redirect, St. Clair affirmed that after he received

26

Williams' July 18, 2002, letter, he spoke with Williams and Williams decided to accept the plea agreement. Tr. at 110-111. St. Clair acknowledged that the term "Government's offer" in the letter could mean something other than a plea agreement, but that Williams had affirmed he meant the plea agreement when St. Clair discussed the letter with him. Tr. at 111, 116. St. Clair did not think the term related to Janes' plea agreement. Tr. at 112. St. Clair acknowledged that the letter also stated that it was two (2) weeks prior to trial and he had not personally met with Williams. Tr. at 113, 117. St. Clair also acknowledged that Williams expressed concerns that an attorney could not properly prepare for trial without meeting with the client. Tr. at 113. St. Clair stated that in response to the letter, he advised Williams that he appeared to be trying to intentionally cause a mistrial or set up an allegation of ineffective assistance of counsel, and that Williams either needed to work with St. Clair or request his removal. Tr. at 114. In response, Williams assured St. Clair that he was happy with St. Clair, and that he was upset with Janes. Tr. at 114. It was during that conversation that Williams indicated he again wanted the plea agreement. Tr. at 114. St. Clair interpreted Williams' rejection of the plea agreement as proof that Williams had seen the actual agreement prior to writing the letter. Tr. at 117. St. Clair reiterated that he gave Williams his home phone number in response to his complaint in the July 18, 2002,

27

letter that his calls to St. Clair's office were not being accepted. Tr. at 115.  St. Clair did not know which guard he gave the plea agreement to to pass to Williams during his visit.  Tr. at 118.

## C.  **Testimony of Robert Sandwich**

Williams then called Robert Sandwich as a witness.  Sandwich worked as an associate with St. Clair in 2002, beginning in June of that year.  Tr. at 125, 127.  Sandwich testified that he was admitted to the Virginia Bar, and acknowledged that made him subject to the Code of Professional Responsibility.  Tr. at 125-26. Sandwich does not do federal practice,[20] but at the time he met with Williams, he was a member of the Court of Appeals for the Fourth Circuit.  Tr. at 135, 156.  He assumed that in discussing the plea agreement, the sentencing guidelines needed to be discussed, but did not know what edition applied to Williams.  Tr. at 134-35.

Sandwich stated that he would designate responsibility to a subordinate so long as the subordinate was a competent attorney. Tr. at 127.  Sandwich agreed that a plea agreement is a fairly serious responsibility to prepare and negotiate and deliver to a client.  Tr. at 127.  Sandwich became aware of Williams' plea agreement in early July, 2002. Tr. at 127-28.  Sandwich identified

---

[20]The Court notes that an admission to practice before the federal court relates to appearances in court and authority to sign pleadings.  See E.D. Va. Loc. Crim. R. 57.4.  Client counseling, such as Sandwich's discussion of the plea agreement with Williams, does not appear to be prohibited by this rule.

Government's Exhibit No. 1 as that plea agreement, and acknowledged that the only defense counsel's name on the agreement was "Duncan St. Clair III."   Tr. at 128-29.   Sandwich acknowledged that the plea agreement stated the maximum penalty for the offense.   Tr. at 151.   Sandwich believed St. Clair had been appointed by the court to represent Williams.   Tr. at 129.   Sandwich acknowledged that it was St. Clair's responsibility to prepare and negotiate the plea agreement, but that it could be delivered to Williams by a subordinate or the United States Postal Service. Tr. at 129. Sandwich did not know when St. Clair received the plea agreement, but assumed it was after July 1, 2002.   Tr. at 152.   Sandwich had witnessed St. Clair deliver plea agreements to clients. Tr. at 130. Sandwich was not aware of whether St. Clair had obtained Williams' express consent to discuss Williams' case with Sandwich.   Tr. at 130.   Sandwich acknowledged that he did not ask for Williams' express consent to discuss Williams' case or plea agreement with him, but that he thought there was a tacit agreement because Williams did speak to him.   Tr. at 130.   Sandwich stated that he had first met Williams with Rosenblum, that they had introduced themselves as attorneys that worked in St. Clair's office, and that they would at various times be talking about Williams' case.   Tr. at 131.   They never specifically asked for Williams' consent to discuss his case with him.   Tr. at 131.   Sandwich met with Williams three times: the first time with Rosenblum in late June, 2002; the

second time alone; and the third time with the probation officer doing Williams' report.[21]   Tr. at 132, 147.   St. Clair never accompanied Sandwich in meeting with Williams.   Tr. at 141. Sandwich did not know when St. Clair first met with Williams, and did not know if anyone else from the firm met with Williams between Sandwich's first two visits.   Tr. at 147, 153.

At the first meeting, Rosenblum did the talking with Williams using the telephone, in order to get information from Williams about his case.   Tr. at 132.   Because Rosenblum used the phone, Sandwich did not hear Williams' side of the conversation.   Tr. at 134.   Sandwich could not recall if it was possible to pass documents back and forth in the room, but did recall that the room had a glass screen.   Tr. at 133-34.   Sandwich and Rosenblum did not bring the plea agreement to this first meeting.   Tr. at 134, 136. After this meeting, Sandwich did not tell St. Clair that Williams wanted to plead guilty because he had no indication of this from that meeting.   Tr. at 148.

Sandwich's second meeting with Williams was in early July, possibly the 12th.   Tr. at 136-37.   At that time, Sandwich attempted to review the plea agreement with Williams.   Tr. at 136, 139-40, 149.   Sandwich could not recall if Williams had his own copy of the agreement, but thought Williams had some document.   Tr.

---

[21]The transcript states this was a "probation report," but according to the record, Sandwich was present when Williams was interviewed for his presentence report.

at 139, 145, 148.  Sandwich could not recall how far he got into the review of the plea agreement before Williams rejected it and told Sandwich to tell St. Clair to prepare for trial.  Tr. at 149-50.  Sandwich did recall discussing the fine and the supervised release in the agreement.  Tr. at 151.  Sandwich also did not know if this was the first time Williams had a chance to look at or review the plea agreement.  Tr. at 145.  Sandwich did not think there was necessarily an extensive delay in getting the plea agreement to Williams because he did not know when it was received or if the delay was because other attorneys were in court at that time.  Tr. at 153-54.  Sandwich knew "there was some discussion about [Janes] and a plea agreement," but did not know the details of that discussion.  Tr. at 137-38.  Sandwich also knew that Williams was adamant about Janes getting a misdemeanor, and rejected the plea agreement on this ground; Williams told Sandwich he would not discuss the plea agreement until Janes got a misdemeanor.  Tr. at 138-40, 145. Sandwich did not think it was strange for St. Clair to ask Sandwich to discuss the plea agreement with Williams.  Tr. at 142.  He thought he was asked to do it because he was able to spend some time to address Williams' concerns.  Tr. at 154.  Sandwich acknowledged that if Williams had indicated he wanted to plead guilty, Sandwich would have had to relay that to St. Clair.  Tr. at 146. Sandwich stated he did not obtain an acknowledgment or consent form that he discussed or tried

31

to discuss the plea agreement with Williams.  Tr. at 148.  Sandwich stated that St. Clair was a little perturbed by Williams' rejection of the plea agreement because St. Clair thought it was a good offer and Williams was taking a big risk in light of the charges he was facing.  Tr. at 155.

Sandwich acknowledged that by the date of his second meeting with Williams, St. Clair had been appointed to represent Williams for four (4) weeks.  Tr. at 137. In addition to discussing the plea agreement, Williams gave Sandwich a handwritten motion to dismiss. Tr. at 137, 151-52.  Williams and Sandwich also discussed <u>Apprendi</u> case law, and Williams gave Sandwich a voluminous number of documents on this topic for St. Clair's review.[22]  Tr. at 137, 152. Sandwich also acknowledged that Williams instructed him to tell St. Clair to coordinate the defense with Kimball.  Tr. at 141, 150. Sandwich acknowledged that Williams did want Sandwich to tell St. Clair that Williams wanted to meet with him.[23]  Tr. at 143, 153.

---

[22]Sandwich appeared to agree that the <u>Apprendi</u> discussion was in lieu of discussions about the plea agreement, but the transcript also shows that Williams interrupted him at this point.  Tr. at 137.  Because the Court finds Sandwich's other statements that he did discuss the plea agreement with Williams credible and because the interruption may have caused Sandwich to mishear the question, the Court disregards this statement.  <u>See</u> Tr. at 136-37, 139.

[23]Williams' phrasing of this question suggests that he repeatedly made this request in the course of several visits.  Tr. at 143. Because the question stated "after the first time" and Sandwich only met with Williams once between the first visit and Williams' trial, this answer must relate solely to the July 12, 2002, visit. <u>See</u> Tr. at 143.

Sandwich did not recall Williams being concerned that St. Clair's office was not accepting his collect calls.  Tr. at 143.

Sandwich did not think it would be strange for St. Clair to request somebody come along with him for his discussion of a plea agreement.  Tr. at 141.  Sandwich stated that he only visited a prisoner with St. Clair one time previously.  Tr. at 142.  Sandwich never witnessed St. Clair putting the plea agreement in Williams' hands or reading it to him.  Tr. at 142-43.  Sandwich assumed St. Clair sent his associates to the jail because personal contact was appropriate to assist St. Clair in discussing possible defenses so that St. Clair could more adequately prepare Williams' case.  Tr. at 144.  Sandwich thought St. Clair trusted his associates enough to allow them to discuss part of the case or certain issues with Williams.  Tr. at 144.  Sandwich thought St. Clair's paralegal scheduled the meetings with Williams.  Tr. at 144.  Sandwich thought there was one time that he went to the jail and was unable to meet with Williams because it was not during regular visiting hours, but he had no difficulties any other time.  Tr. at 144-45.  Sandwich never heard Williams state that he wanted to plead guilty; any information he had on this issue came from St. Clair.  Tr. at 149.

Sandwich never witnessed St. Clair avoiding clients that are in jail.  Tr. at 156.  Sandwich stated that St. Clair did not delegate all of his meetings concerning plea agreements, but

because Sandwich only worked for St. Clair for a little over a year, he could not be more specific on the number that was delegated.  Tr. at 157.  Sandwich stated that St. Clair never indicated he chose to delegate meetings with prisoners based on their distance from his office.  Tr. at 157.

Seidel had no questions for this witness.  Tr. at 158.

### D. **Testimony of Michael Rosenblum**

Michael Rosenblum testified next.  Rosenblum stated he was a member of the Virginia Bar, and was admitted to the Federal Bar in 2000. Tr. at 159, 164-65.  In 2002, Rosenblum worked for St. Clair. Tr. at 159.  Rosenblum stated that St. Clair sent him to see Williams regarding his case, that Rosenblum introduced himself and discussed the facts of Williams' case with him, and that Williams did not say anything to indicate he was unhappy with being interviewed by Rosenblum.  Tr. at 160-61.  Rosenblum did not state he was a go-between for St. Clair, but did indicate that the purpose of the meeting was to get St. Clair better prepared for Williams' case.  Tr. at 160.  Rosenblum met with Williams in late June, a few days or so after St. Clair was appointed by the court. Tr. at 160.  Rosenblum did not recall bringing a plea agreement to this meeting, did not discuss the plea agreement with Williams at any time, and did not know if a plea agreement had been made with Shelton.  Tr. at 161, 163-64.  Rosenblum did obtain certain terms Williams was looking for in a plea agreement, and talked about that

34

information with St. Clair.  Tr. at 164.  Rosenblum had no personal knowledge of the relevant sentencing guidelines, but acknowledged that Williams told him during the meeting that Shelton had advised him that the guidelines applicable to his case were between twenty-four (24) and thirty (30) months[24] at that time.  Tr. at 164.

Rosenblum was presented with the plea agreement, Government's Exhibit No. 1.  Tr. at 162.  He did not recall seeing it previously.  Tr. at 162.  He specifically stated he never saw it in Williams hands nor did he give it to Williams.  Tr. at 162. Rosenblum acknowledged that St. Clair's signature block was on the agreement and that it was signed by the government on July 1, 2002. Tr. at 162.

Rosenblum also accompanied St. Clair on a visit with Williams to keep St. Clair company on the drive.  Tr. at 161.  Rosenblum did not have a conversation with Williams during that visit, and could not recall any specifics from St. Clair's side of the conversation. Tr. at 161, 168.  Rosenblum thought this meeting took place in the attorney panel, but acknowledged he could have been mistaken.  Tr. at 166-67.

Rosenblum found out after the case that Sandwich had met with Williams.  Tr. at 165.  Rosenblum did not know anything about Sandwich's admission to the Federal Bar, nor did he know if it

---

[24]These sentencing guidelines match those in the letter Haynie provided to Shelton, Government's Exhibit No. 4, that were based on the charges in the plea agreement offered to Williams.

would be inappropriate for someone not admitted to the Federal Bar to discuss federal sentencing guidelines with a defendant.  Tr. at 165.

Seidel had no questions for this witness.  Tr. at 168.

### E. Administrative Issues

At this point, Williams offered Petitioner's Exhibit No. 3, the log St. Clair filed with the court for his time, into evidence.[25]  Tr. at 171.  Williams also stated he would not be testifying.[26]  Tr. at 171.

### F. Testimony of Stephen W. Haynie

Assistant United States Attorney, Stephen W. Haynie, was the last witness Williams called .  Haynie stated that he had worked in

---

[25]Because this document had been filed in this Court, the Court was able to obtain a copy of the document during a recess in the evidentiary hearing, but not until after the related questioning of St. Clair had been completed. Tr. at 124.  Counsel for Respondent did not object to entering the document into evidence, but did object to Williams' initial request to have the Court provide him a copy in the middle of the hearing.  Compare Tr. at 170 with Tr. at 92-93.

[26]As discussed supra, note 9, Williams made a motion to dismiss his appointed counsel and to proceed pro se.  To accommodate this request, but also to protect Williams' interest in a fair hearing, the Court granted the motion, but directed that the appointed counsel, Crump, continue to advise Williams as stand-by counsel.
At this point in the hearing, Crump advised the Court that there was a "potential of perjury" and she had advised Williams not to testify. Tr. at 169, 171.  Crump then requested the Court ask Williams on the record if he intended to testify.  Tr. at 169.  The Court then advised Williams that he could be subject to prosecution for perjury if he took the stand and made untrue statements, and gave him an additional opportunity to consult with Crump on the issue.  Tr at 171-72.

Norfolk since 1999, but had been with the U.S. Attorney's office since 1996.  Tr. at 176.  Haynie had prosecuted the case against Williams.  Tr. at 177.  Williams' plea agreement had been initiated by contact from St. Clair on or before July 1, 2002, but Haynie did not recall specifically what St. Clair said.  Tr. at 177-78. Haynie stated that he normally sends out a completed plea agreement within a day or two after receiving a request from defense counsel. Tr. at 177.  Haynie stated that there is a standard plea agreement on the computer that he revises through additions and deletions. Tr. at 178.  He then provides it to his supervisor, and after resolving any questions, they both sign it.  Tr. at 178.  Williams' agreement was approved by Haynie's supervisor, Smythers, and this part of the process usually takes just a few minutes.  Tr. at 179. Haynie then faxes the signed copy to the defense attorney, unless somebody in defense counsel's office is going to come by and pick it up.  Tr. at 178-79.  It was Haynie's best guess that Williams' agreement was faxed to St. Clair.  Tr. at 179.  Haynie stated he was not in the habit of putting time limitations on plea agreements, and he did not recall one in this case.  Tr. at 181. Haynie stated that he had used the year 2000 sentencing guidelines in a June 19, 2002, letter he sent to Shelton.  Tr. at 183-84. Haynie was given that letter, Government's Exhibit No. 4, and confirmed that it stated it was based on the November 2000 fraud guideline.  Tr. at 183.  Haynie also read the sentencing range from

the letter, 24 to 30 months.  Tr. at 184.

Haynie had no first-hand knowledge of any visits between St. Clair and Williams.  Tr. at 180.  Haynie recalled that St. Clair had told him, possibly more than once, that he had met with Williams and Williams wanted a plea agreement, but St. Clair needed more time.  Tr. at 180.  Haynie suspected this was a ruse.  Tr. at 180.  St. Clair reported to Haynie that Williams had rejected the plea agreement a few days after St. Clair had indicated Williams was going to accept it.  Tr. at 180-81.  Haynie could not recall when this was.  Tr. at 181.  Haynie stated that St. Clair seemed to think it was in Williams' best interest to plead guilty.  Tr. at 185.  Haynie indicated the plea agreement fell through because they thought it was likely that Janes could get a suspended sentence, but that fell through.  Tr. at 185.

Haynie confirmed that St. Clair was appointed Williams' counsel around June 21, 2002, and as a result Williams' trial was moved back from July 1, 2002, to August 1, 2002.  Tr. at 184.  Haynie stated that the gap between St. Clair's appointment and trial was normal.  Tr. at 184.

Haynie stated that Janes' plea agreement was sent out on June 28, 2002.  Tr. at 185.  Haynie agreed that most people accept plea agreements in federal prosecutions.  Tr. at 186.

Seidel had no questions for this witness.  Tr. at 188.

G.  Proffer of additional testimony and objections

38

At this point, Williams made a proffer regarding two witnesses who were located outside the Court's jurisdiction, Janes and House. Tr. at 189-91.  Williams also stated six objections, the fifth relating to the Court's prior decision denying a subpoena for Smythers.  Tr. at 194-98.  The Court determined Smythers had no direct knowledge of the plea agreement, and the proffered testimony of Janes and House was not relevant and cumulative.  Tr. at 199. The Court declined to authorize further proceedings with regard to the testimony of Smythers, Janes, and House. Tr. at 199.  Williams then objected to this ruling.  Tr. at 199.  This concluded the hearing.

Williams and Respondent presented closing arguments on August 9, 2005, after the transcript of the evidentiary hearing had been filed and both sides had the opportunity to submit proposed findings of fact and conclusions of law.[27]  (Doc. Nos. 135 and 136).

After listening to the testimony of the witnesses at the evidentiary hearing, reviewing the memoranda submitted by the parties, and reviewing the applicable statutory and case law, the Court recommends DENYING Williams' motion to vacate, set aside, or correct his sentence as to the question of ineffective assistance

---

[27]Williams' findings of facts and conclusions of law was accompanied by a Motion for Transcript of 8/9/2005 Proceedings. (Doc. No. 137).  Because the basis for this motion was to enable Williams to prepare the corresponding findings of fact and conclusions of law, and because the motion was filed simultaneously with Williams' findings of fact and conclusions of law, the Court denies it as untimely and moot, see supra, section II.

of counsel by Duncan St. Clair III, Esq., in regard to obtaining and reviewing Williams' plea agreement.

## IV.  **INEFFECTIVE ASSISTANCE OF COUNSEL**

Williams alleges ineffective assistance of counsel in that counsel allegedly failed to obtain and review a plea agreement.

### A. **Standard of Review**

The controlling standard for ineffective assistance of counsel claims is found in Strickland v. Washington, 466 U.S. 668 (1984). Strickland requires the Court to analyze Williams' claims under a two-prong test: competence and prejudice.  To grant relief, the Court has to find (1) Williams' lawyer's performance fell below the range of competence demanded of lawyers in criminal cases, Strickland, 466 U.S. at 690 (the "competence prong" of the test); and (2) there is a reasonable probability that but for the deficient performance by counsel the ultimate result would have been different.  Strickland, 466 U.S. at 694 (the "prejudice prong" of the test).  The Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.

When assessing counsel's performance, the Supreme Court has stressed that the constitutional guarantee of effective assistance of counsel seeks only to "ensure that criminal defendants receive a fair trial," and not to "improve the quality of legal representation."  Strickland, 466 U.S. at 689.  Accordingly, courts

examining counsel's performance must grant a "heavy measure of
deference to counsel's judgments," and, in doing so, may only
evaluate such performance from counsel's own perspective and in
light of all the circumstances at the time of the alleged error.
Id. at 690-91; Kimmelman v. Morrison, 477 U.S. 365, 381 (1986).
Additionally, a reviewing court generally should assess counsel's
overall performance throughout the case, Kimmelman, 477 U.S. at
386, and avoid "Monday morning quarterbacking."  See Stamper v.
Muncie, 944 F.2d 170, 178 (4th Cir. 1991); Strickland, 466 U.S. at
689 (every effort must be made to eliminate the distorting effects
of hindsight).

The second prong of the Strickland analysis presents an
equally rigorous standard.  To demonstrate prejudice, a petitioner
cannot merely speculate that his attorney's error had "some
conceivable effect" on the outcome of the case; rather, the
petitioner must affirmatively prove the outcome of the case would
have been different but for counsel's deficient performance.
Strickland, 466 U.S. at 693.  The Supreme Court has stated that
petitioners face a "highly demanding" task in establishing this
link.  Kimmelman, 477 U.S. at 382.

Additionally, courts need not consider the performance and
prejudice prongs of the Strickland analysis in sequential order.
Strickland, 466 U.S. at 697.  The Supreme Court has advised that,
when evaluating ineffective assistance of counsel claims, courts

41

should choose to apply whichever prong more quickly disposes of the respective claim.

## B. <u>Analysis</u>

As stated <u>supra</u>, to prevail in the instant motion, it is Williams' burden to overcome a strong presumption that St. Clair's performance fell within the range of reasonable performance. Williams provided testimony from five (5) witnesses, four[28] (4) of which provided strongly corroborating testimony that not only was a plea agreement obtained for Williams, but it was also reviewed with him on several occasions. <u>See infra</u>. Williams attempted through his questioning to highlight perceived discrepancies in the testimony, but did not provide any independent evidence to dispute this testimony, nor did he effectively challenge the statements in his own letters rejecting the "government's offer." Consequently, Williams not only failed to meet the burden of proof for showing his counsel's performance was ineffective, he failed to even prove the substantive portion of his allegations. Against this background, the Court will still conduct the <u>Strickland</u> analysis for the two parts of Williams' claim.

## 1. <u>Obtaining Plea Agreement</u>

The Court first examines whether St. Clair's performance fell

---

[28]The remaining witness, Wilcox, had no personal knowledge of, and was therefore not questioned regarding the plea agreement process. He testified solely about the jail's process for attorney visitation and prisoner telephone use.

below the range of competence demanded of lawyers in criminal cases under the first prong of <u>Strickland</u>, with regard to the alleged failure of St. Clair to obtain a plea agreement.

Two copies of the plea agreement signed by Smythers on July 1, 2002, were offered at trial. Petitioner's Exhibit No. 2; Government's Exhibit No. 1. St. Clair stated that he contacted Haynie for a plea agreement, and even reviewed a draft before the final agreement was produced. Tr. at 43, 53, 61-62, 95-96. Haynie corroborated this by confirming that St. Clair initiated plea discussions prior to July 1, 2002. Tr. at 177-78. Haynie testified that based on the usual process, the plea agreement was likely completed within two (2) days from its request and faxed to St. Clair's office. Tr. at 177-79. Sandwich confirmed that the plea agreement was received by St. Clair's office because Sandwich took the agreement to his meeting with Williams on July 12, 2002. Tr. at 136-37, 139-40, 149. Further proof that an agreement was obtained exists in Williams' own letters, <u>e.g.</u>, Government Exhibits No. 2-3, rejecting the "government's offer." This Court does not find persuasive Williams' suggestions during witness examination that this term meant something other than his plea agreement.

St. Clair stated that one of the issues with the plea agreement was obtaining a favorable agreement for Janes. Tr. at 53-54, 62, 67, 100. This was also corroborated by Haynie who thought the plea agreement fell through because Janes was not given

a suspended sentence.  Tr. at 185.  Further, Williams told Sandwich that he would not accept a plea agreement that did not guarantee Janes a misdemeanor.  Tr. at 138-40, 145.

Clearly, St. Clair not only obtained a plea agreement for Williams, but requested it contain the specific terms that Williams desired.  There is no constitutional right to a plea bargain. Weatherford v. Bursey, 429 U.S. 545, 561 (1977).  Defense counsel cannot always obtain terms sought by defendants, and failure to do so does not equate to incompetence.  See, e.g., Clark v. Braxton, 2001 U.S. Dist. LEXIS 15258, at *8-9 (W.D. Va. Sept. 24, 2001) (holding counsel not ineffective for failing to negotiate plea agreement because defendant was adamant about being acquitted). For this reason, this Court recommends this portion of Williams' claim be DENIED.[29]

## 2.  **Reviewing Plea Agreement**

The second part of Williams' claim is that St. Clair never reviewed the plea agreement with him.  St. Clair stated that the agreement was forwarded to Williams, but St. Clair could not recall how this was done.  Tr. at 61.  St. Clair also stated that the agreement was reviewed with Williams before St. Clair's July 19, 2002 visit.  Tr. at 61.  This was corroborated by Sandwich who stated he was sent to review the plea agreement with Williams.  Tr. at 136, 139-40, 149.  Sandwich also stated that, at this meeting,

---

[29]The Court sees no need to address the prejudice prong.

Williams rejected the agreement because it lacked the guarantees for Janes.  Tr. at 138-40, 145.  This rejection was corroborated by Williams' own letters on July 18, 2002, that confirm his rejection of the "government's offer."  Government's Exhibit Nos. 2-3.

Apparently in response to Williams' rejections of the agreement, St. Clair called him, at which point, Williams indicated he wanted to accept the agreement.  Tr. at 110-111, 114.  St. Clair then visited Williams on July 19, 2002, to ensure they were both addressing the same agreement.  Tr. at 43, 60-61, 95, 97.  St. Clair stated that the agreement was passed to Williams by a guard, and Williams held it up to the window to show he had it.  Tr. at 60.  St. Clair stated he went through the agreement line by line and also reviewed the relevant sentencing guidelines.  Tr. at 43, 49, 51, 57, 59, 74, 95.  At that point, Williams again rejected the agreement and St. Clair left it with him.  Tr. at 43, 60, 97.  St. Clair returned to the jail on July 25, 2002, and July 31, 2002, and again discussed the agreement with Williams.  Tr. at 43, 52-53, 56, 82, 84, 87.  Even though this was close to trial, there was no time limit on the agreement, other than that it had to be completed prior to trial, to prevent St. Clair from continuing to encourage Williams to accept the agreement.  Tr. at 41, 181.  St. Clair made sure that Williams had his home telephone number, and this would have enabled Williams to contact St. Clair if he changed his mind about accepting the agreement prior to trial.  Tr. at 60, 87-88,

97, 115.

Although Haynie conceded he had no first-hand knowledge of any visits between St. Clair and Williams, he confirmed that St. Clair had advised him more than once that Williams had accepted and then rejected the agreement. Tr. at 180-81. St. Clair's and Sandwich's visits are corroborated both by the prison log, Petitioner's Exhibit No. 1, and the log St. Clair filed with the court, Petitioner's Exhibit No. 3.

The Court finds there is sufficient evidence in the record that St. Clair and his associate, Sandwich, reviewed the plea agreement with Williams, and Williams rejected it because he was dissatisfied with the terms. Counsel can only advise clients to accept an agreement, but cannot override the client's decision to decline the agreement. Va. Sup. Ct. R. Pt. 6, Sec. II, 1.2(a). As stated by St. Clair in his testimony, this claim appears based simply on Williams' dissatisfaction with the outcome of his trial. Tr. at 72, 99-100. That does not equate to incompetence. Wright v. Angelone, 151 F.3d 151, 161 (4th Cir. 1998); see also, Butler v. Ozmint, 2005 U.S. Dist. LEXIS 29420, at *9-10 (D.S.C. Nov. 15, 2005) (rejecting as groundless ineffectiveness of counsel claim that counsel never informed defendant of plea agreement containing 15-year sentence), and the Court finds none is substantiated for this allegation. Accordingly, the Court recommends that this

portion of Williams' claim be DENIED.[30]

Therefore, there is no merit to Williams' allegation of ineffective assistance of counsel regarding his counsel obtaining and reviewing his plea agreement.

## V.  **RECOMMENDATION**

For the foregoing reasons, the Court, having conducted an evidentiary hearing, and having DENIED Williams' motions referenced as Doc. Nos. 81, 89, 98, and 137, RECOMMENDS that Williams' claim of ineffective assistance of counsel, regarding his counsel having failed to obtain and review a plea agreement, in his motion to vacate, set aside, or correct his sentence, be DENIED with prejudice.

## VI.  **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules.  A party may respond to another party's objections within ten (10) days after being served with a copy

---

[30]The Court again sees no need to address the prejudice prong.

thereof.

2.  A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984), <u>cert. denied</u>, 474 U.S. 1019 (1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208 (1984).



                                        /s/
_____   _____
                                  F. Bradford Stillman
                                  United States Magistrate Judge

Norfolk, Virginia

June 30, 2006

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to the following:

Rodney Hank Williams
No. 21760
Western Tidewater Regional Jail
2402 Goodwin Boulevard
Suffolk, VA 23434
PRO SE

Kim M. Crump, Esquire
735 Newtown Road, Suite 204
Norfolk, VA 23502
STAND-BY COUNSEL

Robert J. Seidel, Jr., Esquire
Assistant United States Attorney
United States Attorney's Office
8000 World Trade Center
Norfolk, VA 23510
COUNSEL FOR RESPONDENT

Fernando Galindo,
Acting Clerk of Court


By: _____

Deputy Clerk

June    , 2006

49